Filed 3/7/24 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL -- STATE OF CALIFORNIA

FOURTH DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MIGUEL R., a Person Coming Under the Juvenile Court Law. | E082250 |
| _____ | (Super.Ct.No. J279577) |
| THE PEOPLE, Plaintiff and Respondent, | The County of San Bernardino |
| v. | **ORDER MODIFYING** |
| MIGUEL R., Defendant and Appellant. | **OPINION** |
| _____ | [NO CHANGE IN JUDGMENT] |

THE COURT

IT IS ORDERED that the opinion filed in this matter on March 1, 2024 is modified as follows:

In part (1) of the last sentence on page 9, replace the phrase "by probation officer Miguel Ramirez-Gamboa" with the phrase "by a probation officer".

Other than this modification, the opinion remains unchanged. This modification does not affect the judgment.

CERTIFIED FOR PUBLICATION

<u>MENETREZ</u>
J.

We concur:

<u>MILLER</u>
Acting P. J.

<u>FIELDS</u>
J.

1

Filed 3/1/24 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| In re MIGUEL R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | E082250 |
| Plaintiff and Respondent, | (Super.Ct.No. J279577) |
| v. | OPINION |
| MIGUEL R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Tony Raphael, Judge. Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

1

This is Miguel R.'s second appeal from an order transferring him from the juvenile court to criminal court under Welfare and Institutions Code section 707 (unlabeled statutory references are to this code). In 2019, a juvenile wardship petition alleged that Miguel committed murder and other offenses when he was 17 years old. In 2022, the juvenile court granted the People's motion under section 707 to transfer Miguel to criminal court. Miguel appealed from the order, and we affirmed in an unpublished opinion. (*In re Miguel R.* (Sept. 22, 2022, E078528) [nonpub. opn.].) The juvenile court accordingly transferred the matter to criminal court in January 2023, after the remittitur issued.

Effective January 1, 2023, Assembly Bill No. 2361 (2021-2022 Reg. Sess.) (Assembly Bill 2361) amended section 707 in several ways, including by raising the standard of proof to clear and convincing evidence on the issue of whether a juvenile should be transferred. (*In re E.P.* (2023) 89 Cal.App.5th 409, 416 (*E.P.*).) The criminal court transferred the matter back to the juvenile court to address the statutory changes. The juvenile court found by clear and convincing evidence that Miguel is "not amenable to the care, treatment and training programs available through the juvenile court system" and again ordered him transferred to criminal court. Miguel appeals from that order, arguing that the juvenile court misapplied the statutory changes and that the prosecution did not carry its burden under the clear and convincing evidence standard. (§ 801, subd. (a).) While the appeal was pending, Senate Bill No. 545 (2023-2024 Reg. Sess.) (Senate Bill 545) further amended section 707.

We affirm. We publish this opinion to clarify certain points about application of the recent amendments to section 707, including that (1) the statute does not require that any one factor be given greater weight than others in determining whether the minor is amenable to rehabilitation while under the jurisdiction of the juvenile court, and (2) although the current version of section 707 expressly requires consideration of the minor's history of involvement in the child welfare or foster care system, human trafficking, sexual abuse, or sexual battery, and prior versions of the statute did not contain that express requirement, evidence of any such history was nonetheless relevant under prior versions of the statute.

## BACKGROUND

### A. *The Alleged Offenses*[1]

One night in January 2019, Steve N. and his wife, Keren N., were walking near their home when they saw three male teenagers dressed in black pants and hoodies approaching. Steve told Keren to get behind him and placed himself between her and the teenagers. The teens stopped in front of Steve and Keren and blocked their path. One teenager, later identified as Miguel, pointed a gun at Steve's head. Keren heard the gunman and one of the other two say, "'Hey, motherfucker, what you got?'" Steve lunged toward the gunman, and a struggle ensued. Keren saw a flash, heard Steve yell,

---

[1] We take the facts concerning the offenses from our prior opinion, which summarized the description of the offenses contained in the probation report. (*In re M.R.*, *supra*, E078528.)

and realized that Steve had been shot. Steve was taken to the hospital, where he died during surgery.

An officer searching the area shortly after the shooting stopped three teenagers matching the suspects' description, two of whom were detained, while the third fled on foot. Other officers searching in the area where the third suspect had fled found a black backpack that contained a loaded .38-caliber revolver with one spent casing under the hammer, a black T-shirt, a black sweatshirt, a cell phone, and other items. In a nearby parking lot, officers found a wallet containing Miguel's California identification card, and a few feet away they found six additional bullets matching the rounds in the revolver.

After initially providing officers with false information, both of the two detained coparticipants made statements incriminating Miguel, identified the backpack containing the gun as Miguel's, and identified Miguel as the shooter in photo lineups. Miguel was arrested at school the following morning. A search of Miguel's home revealed shoes and other clothing matching those worn by the shooter, as well as a box of .38-caliber ammunition matching that found in the revolver.

Text messages found on Miguel's cell phone and statements by his mother revealed that Miguel had texted his mother shortly after the shooting, saying he was hiding from the police. He could see police nearby and a helicopter overhead. Miguel's mother told him to stay hidden. She drove to find him and saw police and blocked streets. The text messages included four maps showing locations where Miguel was hiding, and their communications continued over the course of almost four hours before Miguel's mother was able to pick him up. Miguel's mother identified the backpack,

4

wallet, and identification found by police as belonging to Miguel, but she denied having seen the gun or ammunition before.

Surveillance video obtained by police showed Miguel, wearing a backpack matching that found by police, boarding a bus heading towards Ontario with his two coparticipants a few hours before the shooting. All three were wearing black hooded sweatshirts, dark jeans, and black shoes. They can be seen sitting together and talking before exiting the bus together. Other surveillance videos show the three youths at various locations in the vicinity before and after the shooting.

B. *The Petition and the Initial Transfer Proceeding*

In January 2019, a juvenile wardship petition (§ 602, subd. (a)) was filed, alleging that when Miguel was 17 years old he committed one count of murder (Pen. Code, § 187, subd. (a)), one count of second degree robbery (Pen. Code, § 211), and one count of attempted second degree robbery (Pen. Code, §§ 211 & 664).

The prosecution immediately moved to transfer Miguel to criminal court. In April 2019, the probation department submitted a report pursuant to subdivision (a)(1) of section 707, recommending transfer.

The transfer hearing began in April 2021. The sole prosecution witness was Cynthia Diaz, the probation officer who prepared the report. Diaz explained her methodology, the interviews that she conducted, and the records that she reviewed in preparing the report. The report described Miguel's personal history and included statements from Miguel and his mother. Miguel's parents had been together for 30 years and had six children. Miguel lived with his parents and two younger siblings, aged 10

5

and 11. Miguel said that he got along well with everyone, including his parents and siblings, and his mother agreed. Before he was arrested, Miguel was a senior in high school with grades ranging from several A's to one D. Miguel was not involved in a gang. Miguel denied using drugs and said that he did not like alcohol, which he tried when he was 14 years old. Miguel had not been a victim of sexual or physical abuse.

The report recommended transfer to criminal court on the basis of four of the five statutory criteria: the degree of criminal sophistication exhibited by the minor, whether the minor can be rehabilitated before expiration of the juvenile court's jurisdiction, the success of previous attempts by the juvenile court to rehabilitate the minor, and the circumstances and gravity of the offense. The report determined that the fifth criterion—the minor's delinquency history—weighed in favor of finding that Miguel was suitable for rehabilitation under the juvenile court's jurisdiction.

Diaz reviewed a number of the detention behavior summaries documenting Miguel's conduct in juvenile hall over the two years since she had prepared her report. Miguel was involved in eight incidents described as "code reds," all but one of which involved assaultive behavior on other minors. Although Miguel had obtained his high school diploma and enrolled in online community college courses, Diaz testified that Miguel was currently "suspended until further notice" from participating in the college program for having accessed unauthorized websites, and he had previously been suspended for a semester because of a plagiarism incident. On the basis of her review of Miguel's detention behavior summaries, Diaz continued to believe that Miguel was not amenable to treatment by juvenile services and should be transferred to adult court.

6

In December 2021, Shannon Johnson, Psy.D., a staff psychologist at Patton State Hospital, testified on Miguel's behalf. Johnson met with Miguel in July and August for a total of about three and one-half hours and submitted a psychological evaluation report and a risk assessment report.

Johnson testified that Miguel had demonstrated insight and expressed regret and remorse for the impact of his behavior on his family and on the victim's family, and Johnson believed that Miguel's contrition was honest and genuine. She testified that Miguel had made progress in his rehabilitation, as evidenced by his ability to view his detention as an opportunity to recreate himself and to consider how he would like his life to be in the future. Regarding her risk assessment evaluation, Johnson opined that Miguel was unlikely to seek out violence and that his strong family support mitigated his risk of reoffending, although if Miguel were subjected to violent conduct by someone, he was likely to defend himself. She believed that transferring Miguel to an adult incarceration setting would be destabilizing and have a negative impact on his functioning and eventual reintegration into the community. When asked if Miguel would present a low risk of reoffending or engaging in violence if he were treated in a juvenile facility, Johnson assessed Miguel's risk as "moderate" rather than "low."

On cross-examination, Johnson acknowledged that Miguel had continued to engage in violent behavior during his detention, but she described that behavior as largely "situational" and related to his incarceration. Johnson conceded that Miguel's ongoing use of aggression to manage conflict did increase his risk of reoffending and that he is likely to respond with violence if he is challenged or approached in an aggressive way.

Johnson was also asked during cross-examination about an incident that occurred in October 2021. A staff member had redirected Miguel to take it easy on the other team during a soccer tournament, and Miguel responded: "'You are telling me to chill out[?] You know I'm a murderer on the set.'" When questioned about his response, Miguel said, "'I'm a murderer. I kill people. So what?'" Johnson acknowledged that the statement was not something that Miguel would have said during their meetings, and she stated that if he had said that to her, it would have changed her opinion.[2] When asked if the statement demonstrated that Miguel lacked remorse and empathy, Johnson said that she could not tell without knowing more about the "situational factors" and circumstances in which the incident occurred. She described ways in which the remark may have been mere "posturing" or an expression of "hopelessness."

After Johnson's testimony, the prosecution offered to recall Diaz as a rebuttal witness to testify regarding the detention behavior summary that reported Miguel's October 2021 statements and also to establish that Miguel was again not enrolled in college classes that semester. Both counsel agreed to submit on the document containing the October 2021 statements and stipulated to the fact that Miguel was not attending online college classes that semester, so Diaz was not recalled. Miguel submitted 10 character reference letters, including one written in Spanish and not translated. Some of

---

[2] The court overruled defense counsel's objections to the line of questioning, explaining that it would not consider Miguel's statement for its truth but would allow the question as a hypothetical regarding Johnson's opinion: If Miguel had made such statements, how would that impact her evaluation, recommendation, and diagnosis?

the letters' authors had known Miguel since he was a young child.  The letters described

Miguel as smart, good, respectful, well-behaved, and polite.

C. *The First Ruling and Appeal*

In 2022, the juvenile court granted the People's motion to transfer Miguel to

criminal court.  Miguel appealed from the order, arguing that it should be reversed

because the juvenile court improperly relied on the evidence concerning the

October 2021 incident.  (*In re Miguel R.*, *supra*, E078528.)  He argued that "absent any

evidence as to the 'tone' or 'context' of the remarks, they are 'worthless as an indication

of [Miguel's] purported state of mind.'"  (*In re Miguel R.*, *supra*, E078528.)  We rejected

the arguments and affirmed in an unpublished opinion.  (*In re Miguel R.*, *supra*,

E078528.)

After the remittitur issued, the juvenile court transferred the matter to criminal

court in January 2023.  The criminal court transferred the matter back to the juvenile

court to address recent amendments to section 707 under Assembly Bill 2361.

D. *The Second Transfer Proceeding*

The second transfer hearing was held in August 2023, when Miguel was 21 years

old.  The parties stipulated that the court could take judicial notice of all of the evidence

from the initial proceeding.  The prosecution introduced two documents prepared by the

probation department in April 2023:  (1) a court memo prepared by probation officer

Miguel Ramirez-Gamboa addressing Miguel's conduct while housed in county jail, and

(2) an Assembly Bill 2361 transfer memo prepared by probation officer Paul Vargas.

Three probation officers testified for the prosecution:  Diaz, Vargas, and Shannon Kim. No witnesses testified on behalf of Miguel.

In preparation for the hearing, Diaz reviewed the 2019 probation report that she had authored and the 2023 transfer memo prepared by Vargas.  Diaz understood the new standard for transferring minors to criminal court.  Diaz's opinion about whether Miguel could be rehabilitated by the juvenile justice system remained unchanged:  She did not "believe he'd be appropriate to remain in juvenile hall."  Diaz based her opinion on the fact that Miguel was almost 22 years old and juvenile jurisdiction would end when he turned 25.  She explained that given the severity of the offenses and the sophistication involved, Miguel "would not have enough time remaining to be rehabilitated in the juvenile system."

Vargas testified that he never directly supervised Miguel.  In preparing the April 2023 transfer memo, Vargas reviewed Diaz's 2019 probation report, the police report concerning the alleged offenses, and Miguel's juvenile delinquency history.  Vargas also spoke with Kim about the ARISE program, which is the secure youth treatment facility in San Bernardino County.

Vargas opined that Miguel could not be rehabilitated by the juvenile justice system.  Vargas based his opinion on the "severity of the crime, [Miguel's] active role in it, the sophistication, as well as the limited time that he has under the juvenile jurisdiction." Vargas explained that Miguel would age out of the juvenile system at 25 and thus would have about three and one-half years remaining in juvenile jurisdiction,

which was not sufficient time to rehabilitate. Vargas's supervisor agreed with Vargas's analysis.

Kim worked in the field supervision unit of the ARISE program. She reviewed the reports prepared by Diaz and Vargas and likewise opined that Miguel could not be rehabilitated under juvenile court jurisdiction. Kim considered the factors relevant to qualification for the ARISE program, including the severity of the crime, Miguel's criminal history, whether treatment or rehabilitative programs previously had been offered and the status of any prior programs, and whether the treatment offered in the ARISE program would benefit Miguel.

E. *The Ruling*

In August 2023, the juvenile court issued a detailed ruling and found "by clear and convincing evidence that the youth is not amenable to the care, treatment and training programs available through the juvenile court system under the statutory criteria," and the court accordingly ordered Miguel transferred to criminal court. The court adopted its description of the offenses and various findings from its initial ruling in January 2022, as modified by the new clear and convincing evidence standard of proof, and it addressed each of the five statutory criteria in section 707, subdivision (a)(3) (§ 707, subd. (a)(3)).

The court found that the following factors weighed in favor of transferring Miguel to criminal court: the degree of criminal sophistication, the success of previous attempts by the juvenile court to rehabilitate the minor, and the circumstances and gravity of the offenses. The court found that the prosecution had not carried its burden of proving that

11

Miguel's delinquency history weighed in favor of transferring him or that he could not "be rehabilitated prior to the expiration of the juvenile court's jurisdiction."

With respect to the degree of criminal sophistication, the court adopted its initial ruling, as modified by the clear and convincing evidence standard, and found that Miguel "possesse[d] a higher level of criminal sophistication" because Miguel armed himself, participated in a preplanned armed robbery that was inherently dangerous and showed indifference to human life, and "willfully [shot] the victim for his failure to comply." The court also found that Miguel's conduct after the shooting exhibited "a higher level of criminal sophistication" in that he fled, attempted to conceal his involvement by changing his clothing and appearance, and then lied to police about his involvement.

As for whether Miguel "can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i) (§ 707(a)(3)(B)(i)), the court found that the evidence was "simply insufficient for the Court to draw a conclusion as to whether or not the youth can be rehabilitated." The court noted that for this criterion it was evaluating whether Miguel could be rehabilitated "within the time available." The court described evidence showing that Miguel could be rehabilitated within the time remaining, such as Miguel's behavior in county jail, to which he was moved after the initial transfer hearing. But the court also noted that Miguel's detention period in juvenile hall, including the statements Miguel made in October 2021 about being a murderer, showed that "despite having received rehabilitative services, [Miguel would] still be engaging in negative and callous behaviors." The court also expressed concern that the remaining available

12

juvenile jurisdiction was not a sufficient period for Miguel to be rehabilitated in the ARISE program.

With respect to Miguel's "previous delinquent history" (§ 707, subd. (a)(3)(C)(i)), the court found that Miguel had a single petition in 2016 alleging two nonviolent felony counts. Because that history was minimal and "not aggravated," it weighed in favor of denying the transfer motion.

Regarding the "[s]uccess of previous attempts by the juvenile court to rehabilitate" Miguel (§ 707, subd. (a)(3)(D)(i)), the court found that Miguel had been provided with the entire spectrum of services, including probation, community service, wraparound services, gang intervention classes, house arrest, and a six-month out-of-home placement that included counseling. Miguel did not take probation or "the services received seriously and made no effort to modify his behavior."

With respect to "[t]he circumstances and gravity of the offense alleged" (§ 707, subd. (a)(3)(E)(i)), the court found: Miguel "engaged in a highly dangerous activity that he had to have known would result in harm to another person. Yet he not only willingly engaged in the dangerous activity, but he was seemingly committed to completing it at all costs. This conduct resulted in the death of [Steve]. [Miguel] inflicted the greatest injury on a person that can be inflicted. He stole a person's life. The consequences are irreparable. [Steve] is dead and he shouldn't be. There is no amount of restitution or good will that can change that or adequately compensate [Steve's] family. [¶] There are no mitigating factors related to the circumstances and gravity of the offense. As such, the

13

factors related to this criteria weigh heavily in favor of a finding that the minor should be transferred to adult court."

DISCUSSION

Miguel argues that we should reverse the most recent transfer order because (1) the juvenile court misapplied recent amendments to section 707, and (2) the evidence was insufficient to support the juvenile court's finding that he "was not amenable to rehabilitation in the juvenile court." We are not persuaded.

A. *Legal Framework*

Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court. It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move "to transfer the minor from juvenile court to a court of criminal jurisdiction." (§ 707, subd. (a)(1).) The prosecution bears the burden of proving that the minor should be transferred. (Cal. Rules of Court, rule 5.770(a).)

The Legislature amended section 707 in 2023 and 2024. Effective January 1, 2023, Assembly Bill 2361 amended section 707(a)(3) by adding the following italicized language: "Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. *In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.* In making

14

its decision, the court shall consider the criteria specified in subparagraphs (A) to (E), inclusive.  If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, *which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court*."  (§ 707(a)(3), italics added.)

The five statutory criteria listed in subparagraphs (A) through (E) of section 707(a)(3) were not amended by Assembly Bill 2361.  Those criteria are (1) "the degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)), (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707(a)(3)(B)(i)), (3) "[t]he minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)), (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (§ 707, subd. (a)(3)(D)(i)), and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707, subd.(a)(3)(E)(i)).  The statute sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the five criteria.  (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)

Effective January 1, 2024, Senate Bill 545 amended section 707 to require that with respect to each of those five criteria the juvenile court "shall give weight to any relevant factor," including the specific factors listed as relevant to each criterion.  (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)  The previous version of the statute made consideration of those factors discretionary, not mandatory.  (Former § 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)  With respect to the degree of criminal

15

sophistication, Senate Bill 545 also added new mandatory factors for the court to consider: whether the minor has had any involvement in the child welfare or foster care system and whether the minor has been "a victim of human trafficking, sexual abuse, or sexual battery." (§ 707, subd. (a)(3)(A)(ii).)

We review the juvenile court's ruling on a transfer motion for abuse of discretion. (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 680.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.) The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence. (*Jones*, at pp. 682-683.) In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings. (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11 (*Cardenas*).)

Likewise, we review for substantial evidence the juvenile court's ultimate finding "that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707(a)(3).) Because the juvenile court must make that finding by clear and convincing evidence, we "determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by" the clear and convincing evidence standard. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

16

B.    *Assembly Bill 2361*

Miguel argues that the juvenile court's ultimate determination that Miguel is "not amenable to rehabilitation while under the jurisdiction of the juvenile court" (§ 707(a)(3)) is incompatible with the court's finding under the second criterion that the People failed to produce sufficient evidence that Miguel could not "be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707(a)(3)(B)(i)).  He argues that Assembly Bill 2361's amendments to section 707 "make clear that the youth's amenability to rehabilitation constitutes the focus of *and the single most important factor* in determining whether to grant the requested transfer."  (Italics added.)  The People counter that Miguel "incorrectly conflates the ultimate amenability finding with the second factor, which is primarily concerned with time."  We agree with the People's interpretation.

"In interpreting a statute, our primary goal '"is to determine the Legislature's intent so as to effectuate the law's purpose."'  [Citation.]  '"Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning."'"  (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 294.)  "'"If the statutory language is unambiguous, then its plain meaning controls."'  [Citation.]  We 'avoid "interpretations that render any language surplusage."'"  (*Ibid.*)

Section 707(a)(3) (as amended by Assembly Bill 2361) mandates that the juvenile court "shall consider the criteria specified in subparagraphs (A) to (E), inclusive" in determining whether "the minor is not amenable to rehabilitation while under the

17

jurisdiction of the juvenile court." Thus, according to the statute's plain language, the court is required to consider each of the five listed criteria in determining whether the prosecution has carried its burden of proof to transfer a juvenile to criminal court. (§ 707(a)(3).) "Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" is the second of the five listed criteria. (§ 707(a)(3)(B)(i).) The statute does not direct the juvenile court to afford any greater weight to that criterion. (§ 707(a)(3).) Rather, the statute expressly requires the court to consider all five criteria in making its determination, but the statute says nothing about the relative weight to be given to any of the criteria. (§ 707(a)(3).) The statutory language accordingly does not support Miguel's interpretation that the statute elevates the second criterion to be "the single most important factor in determining whether to grant the requested transfer." (Italics omitted.)

Moreover, the ultimate determination of whether "the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court" (§ 707(a)(3)) is not the same as the second criterion, which calls for consideration of "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707(a)(3)(B)(i)). Assembly Bill 2361 did not make any amendments to the five criteria. "'[W]hen the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction.'" (*City and County of San Francisco v. Strahlendorf* (1992) 7 Cal.App.4th 1911, 1915.) As courts have explained, the focus of the second criterion is whether there is enough time to

18

rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction. (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 721; see also *Kevin P. v. Superior* (2020) 57 Cal.App.5th 173, 200, fn. 13 [in "evaluating the amount of time that rehabilitation in the juvenile system will ultimately require" for § 707(a)(3)(B)(i), the court should consider predisposition progress made toward rehabilitation].) Under the second criterion, the prosecution accordingly "bears the burden of producing evidence of insufficient time to rehabilitate the minor." (*J.N.*, at p. 721.)

In contrast, the ultimate finding that the juvenile court must make under section 707(a)(3) concerns a global assessment of the minor's suitability to rehabilitation within the juvenile court system, and not just a comparison of the time needed with the time remaining. (§ 707(a)(3).) The prosecution bears the burden of proving by clear and convincing evidence that the minor is "not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707(a)(3).) As explained by *In re S.S.* (2023) 89 Cal.App.5th 1277 (*S.S.*), "[t]his language resembles earlier versions of section 707, which, from the enactment of the Juvenile Court Law in 1961 until the approval of Proposition 57, the Public Safety and Rehabilitation Act of 2016, required juvenile courts to analyze whether minors are 'amenable to the care, treatment, and training program available through the facilities of the juvenile court.'" (*Id.* at p. 1286.) Section 707(a)(3)'s focus on the minor's amenability to rehabilitation under the juvenile court's jurisdiction thus requires the court to consider not only time but also other reasons why the minor might or might not be responsive to the available rehabilitative services.

Time is only one of the five statutory criteria that the court must consider in making the determination. (§ 703(a)(3)(B)(i).)

We accordingly conclude that the express terms of section 707(a)(3) require the court to evaluate five criteria in determining whether "the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court" and that the statute does not require that any of those criteria be afforded any greater weight than any other. (§ 707(a)(3).) We further conclude that the second criterion–"[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707(a)(3)(B)(i))—is distinct from the ultimate determination "that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court" (§ 707(a)(3)).

In support of his contrary interpretation, Miguel relies on *E.P.* He claims that *E.P.* reversed the juvenile court's transfer order because the juvenile court's "'totality of the circumstances' approach, and its reliance on the other factors under [section 707(a)(3)], failed to properly consider the effect of" Assembly Bill 2361's amendments. (Underlining omitted.) Miguel's reliance on *E.P.* is misplaced. In *E.P.*, the transfer hearing was held before Assembly Bill 2361 took effect. (*E.P.*, *supra*, 89 Cal.App.5th at p. 411.) Because the court concluded, and the parties agreed, that Assembly Bill 2361 applied retroactively to the case because there was not yet a final judgment, *E.P.* reversed for the juvenile court to hold a new transfer hearing applying the new law. (*E.P.*, at pp. 416-417.) *E.P.* explained: "Under the amended statute, like the previous version, the court has the discretion to conclude that one or more of the five factors predominate so as

20

to determine the result, even though some or all of the other factors might point to a different result. The prosecution is entitled to a new fitness hearing so that the court can determine, considering all five factors, whether [the minor] is amenable to treatment." (*Id.* at p. 417.)

*E.P.* does not support Miguel's interpretation of section 707. *E.P.*'s description of the effect of Assembly Bill 2361 on section 707 does not imply that the amendment gives greater weight to the second criterion, nor does *E.P.* suggest that the second criterion and the ultimate determination are the same. On the contrary, *E.P.* clarifies that section 707(a)(3), as amended by Assembly Bill 2361, requires the juvenile court to consider all five of the listed criteria in making the ultimate determination about the minor's amenability to rehabilitation while under the juvenile court's jurisdiction. (*E.P.*, *supra*, 89 Cal.App.5th at p. 417.)

Because the juvenile court is not required to give greater weight to the second criterion or to deny the transfer motion if that criterion does not weigh in favor of transfer, we conclude that the juvenile court did not err by not according the second criterion greater weight than the other criteria. We further conclude that the juvenile court's finding that Miguel was not amenable to rehabilitation while under the juvenile court's jurisdiction (§ 707(a)(3)) was consistent with its finding that the prosecution had not established that the second factor (§ 707(a)(3)(B)(i)) weighed in favor of transfer.

C. *Sufficiency of the Evidence*

Miguel concedes that the record contains sufficient evidence to support the court's findings under the previous preponderance of the evidence standard of proof. But he

21

argues that the evidence is insufficient under the new clear and convincing evidence standard of proof because (1) the juvenile court relied on Miguel's statements in October 2021 about being a murderer, and (2) there was new evidence of his progress toward rehabilitation. We disagree.

Miguel argues that the court "excessive[ly]" relied on the statements Miguel made in October 2021, "despite the continued lack of evidence of the tone and context of the alleged comments" and "despite [purported] criticism of the relevance of those comments by not only the defense but also this Court." The argument lacks merit for two reasons. First, Miguel mischaracterizes our prior opinion. We did not question the relevance of the October 2021 statements. In fact, we expressly rejected "Miguel's argument that the absence of evidence as to the tone or context of the statements renders them 'worthless as an indication of' Miguel's state of mind reflecting a lack of remorse." (*In re Miguel R.*, *supra*, E078528.)

Second, Miguel's argument that the juvenile court unduly emphasized the October 2021 statements is not supported by the record, just as it was not supported by the record in the prior appeal. (*In re Miguel R.*, *supra*, E078528.) The court's consideration of the October 2021 statements was limited to its analysis of the second criterion, namely, whether Miguel could "be rehabilitated prior to the expiration of the juvenile court's jurisdiction." (§ 707(a)(3)(B)(i).) But the court determined that the second criterion did not weigh in favor of transfer. Miguel's argument that the court unduly relied on the October 2021 statements as a basis to grant the transfer motion therefore fails.

22

Miguel's only other argument concerning the sufficiency of the evidence is that the record contains evidence that Miguel did not have any recent disciplinary issues, completed a substance abuse program, and obtained his GED, all of which tends to show his "progress toward rehabilitation." The argument fails because the existence of contrary evidence does not show that the trial court's findings were not supported by substantial evidence. In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings, not against them. (*Cardenas*, *supra*, 53 Cal.App.5th at p. 119, fn. 11.) We consequently are concerned only with whether ""the circumstances reasonably justify the trier of fact's findings.""" (*People v. Kraft* (2000) 23 Cal.4th 978, 1054.) When evidence reasonably justifies the trier of fact's findings, "'the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

For these reasons, we conclude that Miguel has failed to demonstrate that the juvenile court's finding is not supported by substantial evidence.

D. *Senate Bill 545*

Senate Bill 545 became effective while this appeal was pending, so we asked the parties to file supplemental briefs addressing the effect of the new legislation on this appeal. The parties assume and we agree that the amendments are ameliorative and accordingly apply retroactively to Miguel's case because there is not yet a final judgment. (See *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 304; *S.S.*, *supra*, 89 Cal.App.5th at pp. 1288-1289 [applying Assembly Bill 2361 retroactively].)

With respect to the new factors that must be considered in connection with the first criterion (i.e., the degree of criminal sophistication), Miguel acknowledges that the record "does not disclose any indication that [he] was involved in the child welfare or foster care system, or was a victim of violence, trafficking, or abuse[], and [he] specifically denied being sexually abused." (§ 707, subd. (a)(3)(A)(i)-(ii).) But Miguel argues that because there previously "was no reason to determine or consider whether [those factors] in fact existed in this case," we should reverse and remand so that the parties can develop the record accordingly and the juvenile court can reconsider the motion in light of the new factors. The contention lacks merit.

Before Senate Bill 545, "the effect of the minor's family and community environment" and "childhood trauma" were among the listed factors for the court to consider in analyzing the minor's "degree of criminal sophistication." (Former § 707, subd. (a)(3)(A)(i)-(ii).) Likewise, before Senate Bill 545, "the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior" were listed as relevant to the court's analysis of "[t]he minor's previous delinquent history." (Former § 707, subd. (a)(3)(C)(i)-(ii).) Any evidence of Miguel's involvement in the child welfare system or any history of sexual abuse, sexual battery, or human trafficking would be relevant to his family and community environment and childhood trauma, so such evidence would have been relevant even before Senate Bill 545. The parties therefore had an incentive to develop and present such evidence at Miguel's transfer hearing.

24

Accordingly, the 2019 probation report includes sections about Miguel's family background, personal history, and statements from both Miguel and his mother about his family life. No one reported that Miguel was ever involved in the child welfare or foster care system. The report affirmatively states that Miguel was not a victim of sexual or physical abuse. Likewise, none of the reference letters submitted on Miguel's behalf states that Miguel had any child welfare history, had been sexually abused, or was a human trafficking victim. Thus, even though Miguel had an incentive before Senate Bill 545 to introduce evidence concerning child welfare history and any history of sexual abuse or human trafficking, the record contains none and actually contains contrary evidence.

For all of these reasons, we conclude that it is not reasonably probable that the juvenile court would have reached a result more favorable to Miguel if it had applied the current version of section 707. (*S.S.*, *supra*, 89 Cal.App.5th at p. 1289 [failure to apply amendments to section 707 is reviewed for harmlessness under *People v. Watson* (1956) 46 Cal.2d 818, 836].)

DISPOSITION

The order transferring Miguel to criminal court is affirmed.

CERTIFIED FOR PUBLICATION

MENETREZ
                                                                                    J.

We concur:

MILLER
                    Acting P. J.
FIELDS
                    J.

25